**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **DERIC LAVELLE MAY, #209534,** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| **vs.** | * | **CIVIL ACTION NO:11-00675-KD-B** |
| | * | |
| **TONY PATTERSON,** *et al.*, | * | |
| | * | |
| **Defendants.** | * | |

**REPORT AND RECOMMENDATION**

Plaintiff, an Alabama prison inmate proceeding pro se and in forma pauperis, filed a complaint under 42 U.S.C. § 1983. This action was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.2(c)(4), and is now before the Court on Defendants Tony Patterson, Donny Myers, and Silvia Hicks' Motion for Summary Judgment (Docs. 31, 32, 38, 47), and Plaintiff's response in opposition (Doc. 64). For the reasons stated below, it is recommended that Defendants' motion be granted and that this action be dismissed with prejudice.

**I. Factual Allegations**

From its review of the record, the Court summarizes the parties' allegations that are material to the issues addressed in this Report and Recommendation. Plaintiff Deric LaVelle May suffers from hydrocephalus and in 1990, he had surgery for the placement of a ventriculoperitoneal ("VP") shunt to treat the

excessive buildup of cerebrospinal fluid[1]. (Doc. 32-3 at 19; Doc. 48 at 2). Subsequent thereto, May underwent resection of two AVNs of the brain in 1991 and 1992 at UAB hospital by Dr. Wink Fisher. (Doc. 32-3 at 19). May has been incarcerated at the Holman Correctional Facility ("Holman") since March 14, 2008. (Doc. 64 at 33). Throughout his incarceration at Holman, May has submitted numerous grievances and requests for medical treatment related to his VP shunt and other ailments[2].

After complaining of headaches shortly after his arrival at the facility in March 2008, May received a CT scan on his head on April 23, 2008. (Doc. 32-6 at 46). May had a second CT scan and consulted with a neurologist in June 2008. (Id. at 41). The neurologist recommended that May's VP shunt and ventricles be evaluated by a neurosurgeon because he believed May might have had some hydrocephalus. (Doc. 64 at 21; Doc. 32-3 at 29). On July 8, 2008, May filed a grievance and complained that he was in pain from headaches and that he needed to see a specialty doctor. (Doc. 32-2 at 11). May also asserted that although x-rays had been ordered for him, he cancelled the x-rays because they were not the proper treatment for a head injury. (Id.).

---

[1] VP shunt placement surgery is utilized when there is too much

[2] The medical records are replete with grievances filed by May regarding a variety of health-related issues, and notes documenting the treatment provided May. (Doc. 32-2, Doc. 32-3). His claims before this Court focus on the treatment of his VP shunt.

The record reflects that in response to May's grievance, Defendant Myers informed May that the institution doctor had requested a consultation with a neurosurgeon, and that if the request was approved, an appointment would be made for May. (Doc. 32-2 at 12). May persisted in refusing to have the x-ray conducted, and was informed that he was scheduled to see Dr. Epperson on August 11, 2008; thus, the x-ray was needed. (Id.). May later complained that Defendant Myers was incorrect about the doctor that May was scheduled to visit. Defendant Myers acknowledged that he had, in fact, misspoke, that May was scheduled to see Dr. Quindlen rather than Dr. Epperson, and that Dr. Quindlen was the one who ordered the x-rays. (Doc. 32-2 at 13). When Dr. Quindlen saw May in 2008 Dr. Quindlen "found no particular reason for [May's] headaches." (Doc. 32-3 at 19).

During the summer of 2009, May requested a consultation regarding his VP shunt. Specifically, on May 29, 2009, Plaintiff requested to see a neurosurgeon, and on June 23, 2009, he requested a VP shunt examination because his shunt had been in place for 18 years, and it was his understanding that the shunts were to be checked every 10 years. (Doc. 36-7 at 24, 42-44). On July 22, 2009, May had another CT scan of his head. (Doc. 32-3 at 11). The 2009 CT scan was compared to the CT scan that was taken in April 2008. Based on the comparison, the only postoperative changes noted involved "the posterior fossa and

left occipital lobe region and presence of a VP shunt with no acute process appreciated." (Doc. 32-3 at 11; Doc. 64 at 16).

On August 4, 2009, May requested to see the doctor about his shunt, and he complained that he was not being given the proper medication. (Doc. 32-2 at 5).  On August 28, 2009, May complained that during his meeting with the doctor, he did not have a chance to discuss his CT scan with him, and that the CT scan report was hand written. (Doc. 32-2 at 16).  In response, Defendant Myers advised May that in the non-prison environment, the preliminary report is normally hand written and is followed up with a written report.  May was assured that a written report was in his chart, and that the report reflects that the CT scan showed "no acute process". (Id.).

In a grievance filed in January 2010, May stated that he had a seizure in November of 2009, that blood was taken out of his arm at the time, and that he wanted the results of the test. In response, May was advised that the blood was taken to check his Tegretol level, that his level was low, and that after the test was repeated, the doctor would adjust his medication. (Doc. 32-2 at 17).  In March 2010, May filed a grievance in which he complained about alleged staff misconduct.  According to May, at his previous appointment with the doctor, the nurse interrupted when she should not have because nurses do not possess "enough medical judgement [sic] to know about a VP shunt." (Doc. 32-2 at

4

18-20).   In response, Defendant Hicks advised that the doctor had actually asked the nurse to locate the test results from May's file; thus, the nurse was merely following the doctor's orders.   Hicks also noted that that while nurses are not experts in VP shunts, they do go to school and have knowledge of them. (Id.).   May objected to Defendant Hicks' explanation and insisted that the nurse's conduct was unacceptable and that such misconduct never occurred at any other prison where he had been incarcerated. (Id. at 19).

On April 1, 2010, and subsequent thereto, May filed several grievances regarding scheduling a VP shunt exam.   At one point, May was informed that upon examining his latest CT scan results, the radiologist saw no problems with his VP shunt; therefore, unless he had other symptoms that would indicate an issue with the shunt, no additional examination would be conducted. (Id. at 22).   May complained that a radiologist did not have the necessary medical training to exercise judgment about whether a VP shunt exam was necessary, and that a neurologist and neurosurgeon would need to make that determination. (Id. at 24). After more discussions between May and the medical staff, May was advised on May 4, 2010, that the neurosurgeon had previously ordered an MRI; however, it could not been conducted because of

clips in May's head[3].   Thus, the CT scans had been ordered instead.  May was further advised that a new set of x-rays would be ordered, and once the results were available, he would be sent back to the neurosurgeon when an opening became available. (Id. at 26-29).

On July 12, 2010, May was seen for a second time by Dr. Quindlen, a board certified neurosurgeon, located in Mobile, Alabama. (Doc. 32-3 at 19-20).  Dr. Quindlen found that May was not suffering from severely elevated intracranial pressure; however, he was experiencing "poor shunt function".   Thus, Dr. Quindlen recommended, "obtain[ing] shunt films and admission to the hospital for a shunt revision." (Id. at 20).   The recommended surgery was approved; however, May refused to allow Dr. Quindlen to perform the surgery. (Doc. 1 at 11; Doc. 32-1 at 3, 4; Doc.32-3 at 5).  May has repeatedly indicated that he is not comfortable having Dr. Quindlen perform the surgery because he is not his surgeon of choice, and because he questions whether Dr. Quindlen is following medical protocol.  The need for the recommended surgery has been discussed with May several times; however, he would not sign a release for the surgery. (Doc. 1 at 11; Doc. 32-2 at 30, 33, 38-42, 47-48, 63; Doc. 32-3

---

[3] The record dated September 15, 2008 reflects that May had clips in his head, which made it impossible to perform an MRI. (Doc. 32-3 at 28).

at 3-6, 30, 33, 36; Doc. 64 at 2).   The record reflects that, to date, the recommended shunt revision has not been performed. (Id.).

## II. Procedural History

This action was filed on November 30, 2011. (Doc. 1). Subsequent thereto, May, in February 2012, filed a motion for a preliminary injunction. (Doc. 9).   May sought an order requiring Defendants to provide him VP shunt treatment by the neurosurgeon that originally placed the shunting system in his brain. (Docs. 9, 10).   After finding that May had failed to establish the necessary elements, including irreparable harm, the Court denied May's request for injunctive relief. (Doc. 12).

Defendants answered Plaintiff's complaint and filed Special Reports. [4]   (Docs. 31, 32, 38, 47).   Defendants denied the

---

[4] In his Answer, Defendant Patterson asserts the defense of qualified immunity. (Doc. 38 at 1).   Plaintiff does not specify whether he is suing Defendant in his official or individual capacity or both.   Thus, the Court will consider both. Defendant Patterson is a state official and, thus, is absolutely immune from suit for damages in his official capacity. See Harbert Int'l, Inc. v. James, 157 F.3d 1271, 1277 (11th Cir. 1998) (state officials sued in their official capacities are protected from suit for damages under the Eleventh Amendment). Moreover, "[q]ualified immunity protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Dalrymple v. Reno, 334 F.3d 991, 994 (11th Cir. 2003) (quoting Hope v. Pelzer, 536 U.S. 730, 739, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002)).   In determining whether qualified immunity is appropriate in a given case, "[t]he court must first ask the threshold question whether

material allegations in May's complaint and contend that the record is devoid of any evidence that they acted with deliberate indifference to May's medical needs. (Id.)  In an Order dated October 3, 2012 (Doc. 50), Defendants' Answers and Special Reports were converted into a motion for summary judgment, and the parties were provided an opportunity to file responses in support or opposition to the motion.

May filed a response in opposition to Defendants' motion for summary judgment. (Doc. 64).  He argues that Defendants' motion should be denied because they have failed to meet their burden of establishing that there are no material facts in dispute. (Id.).  Upon review of the pleadings, the motion for summary judgment, and the materials in support and in opposition, the Court finds that the motion is now ripe for resolution.

**III.  Summary Judgment Standard**

In analyzing the propriety of a motion for summary judgment, the Court begins with these basic principles.  The Federal Rules of Civil Procedure grant this Court authority

---

the facts alleged, taken in the light most favorable to the plaintiffs, show that the government official's conduct violated a constitutional right." Dalrymple, 334 F.3d at 995 (citing Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001)).  Having found herein that Plaintiff's allegations do not establish a constitutional violation, "there is no necessity for further inquiries concerning qualified immunity." Saucier, 533 U.S. at 201.

under Rule 56 to render "judgment as a matter of law" to a party who moves for summary judgment.  Federal Rule of Civil Procedure 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  In Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986), the Supreme Court held that "summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact . . ..'"  However, all of the evidence and factual inferences reasonably drawn from the evidence must be viewed in the light most favorable to the nonmoving party. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970); Jackson v. BellSouth Telecomms., 372 F.3d 1250, 1280 (11th Cir. 2004).

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 322.  The movant can meet this burden by presenting evidence showing there is no dispute

of material fact or by pointing out to the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. Id., 477 U.S. at 322-25.

Once the moving party has satisfied its responsibility, the burden shifts to the non-movant to show the existence of a genuine issue of material fact. See Stabler v. Fla. Van Lines, Inc., No. 11-0103-WS-N, 2012 U.S. Dist. LEXIS 1637, *19, 2012 WL 32660, *5 (S.D. Ala. Jan. 6, 2012) (citing Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991)). Summary judgment is proper when, "after an adequate time for discovery, a party fails to make a showing sufficient to establish the existence of an essential element of that party's case." McDowell v. Brown, 392 F.3d 1283, 1288 (11th Cir. 2004) (citations and internal quotation marks omitted). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) (internal citations omitted). "After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is

entitled to judgment as a matter of law." AGSouth Genetics, LLC v. Cunningham, No. 09-745-C, 2011 U.S. Dist. LEXIS 51790, *8-9, 2011 WL 1833016, *2 (S.D. Ala. May 13, 2011) (citing Fed. R. Civ. P. 56(c)).

## IV.    Analysis

### A. Claim against Medical Defendants Hicks and Myers

Plaintiff alleges that Defendants violated his Eighth Amendment rights by failing to provide proper medical treatment for his VP shunt and delaying medical treatment. (Doc. 1 at 8, 13). He specifically alleges that Defendant Myers, who serves as the Corizon Health Services Administrator at the facility, failed to adequately train and oversee medical personnel, delayed medical treatment, and refused to ensure that recommended treatment was carried out. (Id. at 8; Doc. 48 at 5-6). Plaintiff also asserts that Defendant Hicks, who serves as the Corizon Director of Nursing at the facility, disregarded his serious medical need by failing to provide proper treatment, and by failing to provide him with information, when requested, regarding his malfunctioning shunt. (Id.).

The Eighth Amendment provides that, "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. CONST. amend. VIII. "The Eighth Amendment's proscription of cruel and unusual punishments prohibits prison officials from exhibiting deliberate

indifference to prisoners' serious medical needs." Campbell v. Sikes, 169 F.3d 1353, 1363 (11th Cir. 1999) (citing Estelle v. Gamble, 429 U.S. 97, 104, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976)). In Sims v. Mashburn, 25 F.3d 980 (11th Cir. 1994), the Eleventh Circuit delineated the objective and subjective portions of an Eighth Amendment claim as follows:

> An Eighth Amendment claim is said to have two components, an objective component, which inquires whether the alleged wrongdoing was objectively harmful enough to establish a constitutional violation, and a subjective component, which inquires whether the officials acted with a sufficiently culpable state of mind.

25 F.3d at 983 (citing Hudson v. McMillian, 503 U.S. 1, 8, 112 S. Ct. 995, 117 L. Ed. 2d 156 (1992)). To meet the objective element required to demonstrate a denial of medical care in violation of the Eighth Amendment, a plaintiff first must demonstrate the existence of an "objectively serious medical need." Farrow v. West, 320 F.3d 1235, 1243 (11th Cir. 2003). A serious medical need is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" Id. (quoting Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1187 (11th Cir. 1994), overruled in part on other grounds by Hope v. Pelzer, 536 U.S. 730, 739 n. 9, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002)). "In either of these

situations, the medical need must be one that, if left unattended, poses a substantial risk of serious harm." <u>Id.</u> (internal quotation marks).

In order to meet the subjective requirement of an Eighth Amendment denial of medical care claim, the plaintiff must demonstrate "deliberate indifference" to a serious medical need. <u>Farrow</u>, 320 F.3d at 1243. "Deliberate indifference" entails more than mere negligence. <u>Estelle</u>, 429 U.S. at 106; <u>Farmer v. Brennan</u>, 511 U.S. 825, 835, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994). The Supreme Court clarified the "deliberate indifference" standard in <u>Farmer</u> by holding that a prison official cannot be found deliberately indifferent under the Eighth Amendment "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." 511 U.S. at 837. In interpreting <u>Farmer</u> and <u>Estelle</u>, the Eleventh Circuit explained that "deliberate indifference has three components: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." <u>McElligott v. Foley</u>, 182 F.3d 1248, 1255 (11th Cir. 1999); <u>Taylor v. Adams</u>, 221 F.3d 1254, 1258 (11th Cir. 2000) (stating that defendant must have subjective awareness of an "objectively serious need" and that

his response must constitute "an objectively insufficient response to that need").

The undersigned finds that while May's VP shunt and related hydrocephalus constitute serious medical conditions, the record is devoid of any evidence that demonstrates that Myers or Hicks were indifferent to May's medical needs.  To the contrary, May's extensive medical records reflect that he was provided medical treatment at the Holman facility on a regular and consistent basis for a host of ailments. (Doc. 32-2; Doc. 32-3).  May underwent a variety of x-rays and CT scans, was regularly seen by the doctors at the facility, and was sent out for evaluations by specialists, one of whom recommended that May undergo surgery in 2010 in order to address problems with his VP shunt.  While the surgery was approved, May refused to go forward with the surgery because it was to be performed by Dr. Quindlen, a board certified neurosurgeon instead of a surgeon of May's own choosing.   May also questioned whether Dr. Quindlen was following proper medical protocol. (Doc. 1 at 11; Doc. 32-3 at 4-5, 30, 67-68).   Rather than demonstrating deliberate inference, these undisputed facts instead evidence a disagreement over the course of medical care, and as such, they do not rise to the level of deliberate indifference. See Adams v. Poag, 61 F.3d 1537, 1545 (11th Cir. 1995) (whether defendants "should have employed additional diagnostic techniques or forms

of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding" constitutional liability); Harris v. Thigpen, 941 F.2d 1495, 1505 (11th Cir. 1991) (explaining that a difference in medical opinion between the prison's medical staff and the inmate about the inmate's course of treatment will not support a claim of cruel and unusual punishment); see also Waldrop v. Evans, 871 F.2d 1030, 1035 (11th Cir. 1989) ("When a prison inmate has received medical care, courts hesitate to find an Eighth Amendment violation.").   The bottom line is that while May is entitled to treatment for his serious medical needs, he is not entitled to direct the course of treatment that he receives. Accordingly, his refusal, on repeat occasions, to undergo surgery to correct his VP shunt dooms his claim that Defendants Myers and Hicks acted with deliberate indifference.

The Court notes that in his complaint, May argues that Defendants were indifferent to his medical needs on March 12, 2010; however, in his response in opposition to Defendants' summary judgment motion, May attempts to argue, that in 2009, Defendants Myers and Hicks acted so as to cause unreasonable delay in his medical treatment.   The crux of May's argument is that he requested a VP exam in 2009, but he was not seen by Dr. Quindlen until July 2010. (Doc. 48 at 2).   Assuming arguendo that this argument is properly before the Court, the undersigned

finds that May has failed to demonstrate unreasonable delay in medical treatment.

"Delay in access to medical attention can violate the Eighth Amendment . . . when it is tantamount to unnecessary and wanton infliction of pain." <u>Hill</u>, 40 F.3d at 1187 (internal citations and quotation marks omitted). "Cases stating a constitutional claim for immediate or emergency medical attention have concerned medical needs that are obvious even to a layperson because they involve life-threatening conditions or situations where it is apparent that delay would detrimentally exacerbate the medical problem." <u>Id.</u>

> The "seriousness" of an inmate's medical needs also may be decided by reference to the *effect* of delay in treatment. <u>Gaudreault</u>, 923 F.2d at 208; <u>Monmouth County</u>, 834 F.2d at 347. Where the delay results in an inmate's suffering "a life-long handicap or permanent loss, the medical need is considered serious." <u>Id.</u> An inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed. Further, we have held that "[t]he tolerable length of delay in providing medical attention depends on the *nature* of the medical need and the *reason* for the delay." <u>Harris v. Coweta County</u>, 21 F. 3d 388, 393-94 (11th Cir. 1994) (emphasis added). Consequently, delay in medical treatment must be interpreted in the context of the seriousness of the medical need, deciding whether the delay worsened the medical condition, and considering the reason for delay.

<u>Hill</u>, 40 F.3d at 1188-89 (emphasis in original) (footnotes omitted).

With respect to the alleged delay, the undersigned notes, as a preliminary matter, that May has not produced any evidence that demonstrates that either Defendant Myers or Hicks was responsible for deciding whether May was to be evaluated by an outside specialist. (Doc. 32-1 at 4). Further, there is no evidence that there was an unreasonable delay in providing medical treatment to May, or that there was any detrimental effect from any alleged delay in treatment. As noted supra, the record is replete with documentation of the regular and consistent medical treatment that has been provided to May since his placement at the Holman facility in 2008. (Doc. 32-2; Doc. 32-3). The records reflect that in 2008 alone, May underwent a variety of tests, including two CT scans, and was regularly seen by the medical staff at the facility for a number of different ailments. In addition, in 2008, May was also evaluated by two neurologists, including Dr. Quindlen, regarding his VP shunt. (Doc. 32-2 at 12-13; Doc. 32-3 at 19). The medical records further reflect that in 2009, May was regularly treated by the medical staff at the facility, and that on July 22, 2009, he was sent out for another CT scan of his head. (Doc. 32-5 at 29). The impression was postoperative changes mostly involving the posterior fossa and left occipital lob region and presence of a VP shunt with no acute process appreciated. (Id.). While May contends that at that point, he should have been sent out for an

17

evaluation by a neurosurgeon, there is nothing in the CT results that support his assertion.   To the contrary, a review of medical records reflect that May has received regular and consistent treatment since arriving at the facility in 2008, and that while Dr. Quindlen recommended in 2010 that May undergo surgery to address the malfunctioning of his VP shunt, May has repeatedly refused the surgery because Dr. Quindlen is not his surgeon of choice and because he questions whether Dr. Quindlen is following proper protocol. (Doc. 1 at 11; Doc. 32-3 at 5,30). Accordingly, to the extent that there has been delay in the delivery of medical treatment to May, it is clearly the result of his stubborn refusal to adhere to the advice of the medical professionals.   In light of such, May's claims against Defendants Myers and Hicks are due to be dismissed. (Doc. 1 at 11; Doc. 32-2 at 32, 36; Doc. 32-3 at 3-6, 30, 63).

**B. Claim against Defendant Warden Patterson**

May's claim against Defendant Warden Patterson is likewise due to be dismissed.   May alleges that Warden Patterson failed to adequately train and oversee the Defendants who overlooked his serious, life-threatening condition on March 12, 2010, and that he did nothing after being notified of Plaintiff's condition. (Doc. 1 at 8; Doc. 48 at 5-6).

> 'It is well established in this Circuit that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the

basis of respondeat superior or vicarious liability.'
Hartley v. Parnell, 193 F.3d 1263, 1269 (11th Cir.
1999) (internal quotation marks and citation omitted);
Gonzalez, 325 F.3d at 1234 (concluding supervisory
officials are not liable on the basis of respondeat
superior or vicarious liability). Instead, supervisory
liability under § 1983 occurs either when the
supervisor personally participates in the alleged
unconstitutional conduct or when there is a causal
connection between the actions of a supervising
official and the alleged constitutional deprivation.
Gonzalez, 325 F.3d at 1235; Brown v. Crawford, 906
F.2d 667, 671 (11th Cir. 1990). The necessary causal
connection can be established 'when a history of
widespread abuse puts the responsible supervisor on
notice of the need to correct the alleged deprivation,
and he fails to do so.' Gonzalez, 325 F.3d at 1234
(quoting Braddy v. Fla. Dept. of Labor & Employment,
133 F.3d 797, 802 (11th Cir.1998)); Brown, 906 F.2d at
671. Alternatively, the causal connection may be
established when a supervisor's 'custom or policy ...
result[s] in deliberate indifference to constitutional
rights' or when facts support 'an inference that the
supervisor directed the subordinates to act unlawfully
or knew that the subordinates would act unlawfully and
failed to stop them from doing so.' Gonzalez, 325 F.3d
at 1234-35 (quoting Rivas v. Freeman, 940 F.2d 1491,
1495 (11th Cir. 1991)); Hartley, 193 F.3d at 1263; see
also Post v. City of Ft. Lauderdale, 7 F.3d 1552,
1560-61 (11th Cir. 1993). 'The standard by which a
supervisor is held liable in [his] individual capacity
for the actions of a subordinate is extremely
rigorous.' Gonzalez, 325 F.3d at 1234 (internal
quotation marks and citation omitted).


Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir. 2003).

The evidence in this case is undisputed that the Alabama

Department of Corrections contracted with Corizon Health

Services to provide medical care to inmates at the Holman

facility. (Doc. 38-2 at 1-2) May does not allege and there is

no evidence that Warden Patterson was personally involved in

providing medical care to May.   Rather, the record reveals that when Warden Patterson was made aware of May's poorly functioning shunt, he requested that one of the prison doctors speak with May and encourage him to permit Dr. Quindlen to perform the recommended surgery. (Doc. 32-3 at 5).   This limited involvement by Warden Patterson provides no basis for a constitutional claim.   Moreover, as noted supra, the record is devoid of any evidence that supports May's allegation that Defendants were deliberately indifferent to his serious medical needs. Accordingly, May's claim against Warden Patterson is due to be dismissed.

**V.     Conclusion**

Based on the foregoing, it is recommended that Defendants Tony Patterson, Donny Myers, and Silvia Hicks' motion for summary judgment be granted and that this action be dismissed with prejudice.

### Notice of Right to File Objections

A copy of this report and recommendation shall be served on all parties in the manner provided by law.   Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this Court. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); S.D. ALA. L.R. 72.4. In order to be specific, an objection must identify the specific

finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's report and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific.

**DONE** this **24th** day of **July, 2013.**

_/s/ SONJA F. BIVINS_
**UNITED STATES MAGISTRATE JUDGE**